David D. Ritter
State Bar No. 00791534
RITTER SPENCER PLLC
15455 Dallas Parkway, Suite 600
Addison, Texas 75001
Tel.: (214) 295-5078
Fax: (214) 329-4362
dritter@ritterspencer.com

**ATTORNEY FOR THE DEBTORS
SHAWNEE CONSTRUCTION, LLC
CIRCLE L CONSTRUCTION, INC.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **SHAWNEE CONSTRUCTION, LLC,** | § | **CASE NO. 20-42072** |
| **CIRCLE L CONSTRUCTION, INC.** | § | **CASE NO. 20-42073** |
| | § | **(Chapter 11—Subchapter V)** |
| **DEBTOR.** | § | **Jointly administered under 20-42072** |

## JOINTLY ADMINISTERED DEBTORS' SUBCHAPTER V PLAN PURSUANT TO SECTION 1190 OF THE BANKRUPTCY CODE DATED AUGUST 14, 2020

TO ALL PARTIES-IN-INTEREST, THEIR ATTORNEYS OF RECORD AND TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

## ARTICLE I.          INTRODUCTION

Identity of the Debtors

Shawnee Construction, LLC ("Shawnee") and Circle L Construction, Inc. ("Circle L") (together the "Debtors") each filed their voluntary Chapter 11 cases in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division ("Court") on June 16, 2020. Shawnee and Circle L are affiliates and are owned by Richard Van Weezel and Patricia Van Weezel, husband and wife, respectively.  Shawnee performs services in the construction industry. Circle L leases equipment to Shawnee and another related business.  The Debtor proposes to restructure its current indebtedness and continue its operations to provide a dividend to the unsecured creditors of Debtor.

## Explanation of Chapter 11

Chapter 11 is the principal reorganization chapter of the Code. There are different types of Chapter 11 designations. Each Debtor has chosen to proceed under a Subchapter V Small Business Debtor Reorganization ("Subchapter V"). Pursuant to a Subchapter V Chapter 11, a debtor is authorized to reorganize its business for its own benefit and that of its creditors and equity interest holders. Formulation of a plan of reorganization is the principal purpose of a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in the debtor. After a plan of reorganization has been filed, it must either be accepted by holders of claims against, or interests in, the debtor, or be found by the Court not to discriminate unfairly and that it is fair and equitable with respect to each class of claims or interests that is impaired under the plan that has not accepted the plan.

## Explanation of the Process of Confirmation

Acceptance of the plan by the Creditors and Equity Interest Holders is important. In order for the plan to be accepted by each class of claims, the creditors that hold at least two thirds (2/3) in amount and more than one-half (½) in number of the allowed claims actually voting on the plan in such class must vote for the plan and the equity interest holders that hold at least two-thirds (2/3) in amount of the allowed interests actually voting on the plan in such class must vote for the plan. As set forth above, a Subchapter V Chapter 11 does not require that each holder of a claim against, or interest in, the debtor vote in favor of the plan in order for it to be confirmed by the Court.

Confirmation of the plan discharges the debtor from all of its pre-confirmation debts and liabilities except as expressly provided for in the plan and Section 1141(d) of the Code. Confirmation makes the plan binding upon the debtors and all claimants, equity interest holders and other parties-in-interest, regardless of whether or not they have accepted the plan.

## Voting Procedures

**Unimpaired Class**. Claimants in Classes 1 and 10 are not impaired under the Plan. Such Classes are deemed to have accepted the Plan.

**Impaired Classes**. The Class 2 through 9 Claimants are impaired as defined by Section 1124 of the Code. The Debtor is seeking the acceptance of the Plan by Claimants in Classes 2 through 9. Each holder of an Allowed Claim in Class 2 through 9 may vote on the Plan by completing, dating and signing the ballot sent to each holder and filing the ballot as set forth below. Only creditors with Allowed Claims shall have their voted counted absent further Order of the Court.

For all Classes, the ballot must be returned to David D. Ritter, Ritter Spencer, PLLC, 15455 Dallas Parkway, Suite 600, Addison, Texas 75001. In order to be counted, ballots must be **RECEIVED** no later than at the time and on the date stated on the ballot.

## Best Interests of Creditors Test

Section 1129(a)(7) of the Code requires that each impaired class of claims or interests accept the Plan or receive or retain under the Plan on account of such claim or interest, property of a value as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. If Section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the Plan, on account of such claim, property of a value, as of the Effective Date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims. In order for the Plan to be confirmed, the Bankruptcy Court must determine that the Plan is in the best interests of each of the Debtors' creditors. Accordingly, the proposed Plan must provide each Debtor's creditors with more than they would receive in a Chapter 7 liquidation. Since the Debtor's equipment assets are encumbered by UMB Bank and other secured creditors, it is anticipated that in a Chapter 7 liquidation, Shawnee's creditors would receive a very small distribution on their Claims to the extent accounts receivable are available over and above administrative claims, and Circle L's creditors would receive nothing. Accordingly, since the Plan proposes a substantial dividend to all creditors, such creditors are receiving at least as much as they would receive in a Chapter 7 liquidation. Accordingly, the Plan satisfies the requirements of Section 1129(a)(7).

## ARTICLE II DEFINITIONS

Unless the context otherwise requires, the following capitalized terms shall have the meanings indicated when used in this Plan which meaning shall be equally applicable to both the singular and plural forms of such terms. Any term in this Plan that is not defined herein but that is used in title 11, United States Code ("Code") shall have the meaning assigned to such term in the Code.

1. **"Administrative Claim"** shall mean those Claims entitled to priority under the provisions of Section 507 of the Code, pursuant to a claimed and allowed administrative expense priority under Section 503(b) of the Code.

2. **"Allowed Claim"** as to all Classes, hereinafter specified, shall mean a Claim against a Debtor (a) for which a Proof of Claim has been timely filed with the Court by the Bar Date, or, with leave of the Court and without objection by any party-in-interest, late-filed and as to which neither the Debtor nor any party-in-interest files an objection or as to which the Claim is allowed by Final Order of the Court, or (b) scheduled in the list of creditors, as may be amended, prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, as to which no objection to the allowance thereof has been interposed through closing of this case, or as to which any such objection has been determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending. This category includes all Claims deemed unsecured pursuant to §506(a) of the Code. A timely filed Proof of Claim amount will control over a scheduled claim

amount. When "Allowed Claim" is used in the context of a Secured Claim, the provisions of §506(b) of the Code shall also apply.

3. **"Allowed Secured Claim"** shall mean an Allowed Claim secured by a lien, security interest, or other encumbrance on the properties owned by the Debtor, which lien, security interest, or other encumbrance has been properly perfected as required by law, to the extent of the value of the property encumbered thereby. That portion of such Claim exceeding the value of the security held therefor shall be an Unsecured Claim, as defined below and determined pursuant to 11 U.S.C. §506(a).

4. **"Allowed Unsecured Claim"** shall mean an unsecured Claim against Debtor (a) for which a Proof of Claim has been timely filed with the Court by the Bar Date, or, with leave of the Court and without objection by any party-in-interest, late-filed and as to which neither the Debtor nor any party-in-interest files an objection or as to which the Claim is allowed by Final Order of the Court, or (b) scheduled in the list of creditors, as may be amended, prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, as to which no objection to the allowance thereof has been interposed through closing of this case, or as to which any such objection has been determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending. This category includes all Claims deemed unsecured pursuant to §506(a) of the Code.

5. **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

6. **"Bar Date"** shall mean the date fixed by the Court as the last date for filing all Claims in this case other than Administrative and Priority Claims or Rejection Claims.

7. **"Case"** shall mean the above-referenced jointly administered Chapter 11 cases.

8. **"Causes of Action"** shall mean any and all claims, rights and causes of action that have been or could have been brought by or on behalf of the Debtors arising before, on or after the Petition Date, known or unknown, in contract or in tort, at law or in equity or under any theory of law, including, but not limited to any and all claims, rights and causes of action the Debtors or the Estate may have against any person or entity arising under chapter 5 of the Code, or any similar provision of state law or any other law, rule, regulation, decree, order, statute or otherwise, including but not limited to any claim or cause of action under a policy of insurance, claims, if any against officers and directors of the Debtors, avoidance actions under the Code and any other causes of action belonging to the Debtor or the Estate.

9. **"Claim"** shall mean any right to payment from the Debtor as of the date of entry of the Order Confirming Plan whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or can be asserted by way of set-off. Claim includes any right or cause of action based on a pre-petition monetary or non-monetary default.

10.    **"Claimant"** shall mean the holder of a Claim.

11.    **"Class"** shall refer to a category of holders of Claims or interests which are "substantially similar" as provided for in Section 1122 of the Code.

12.    **"Code"** shall mean the United States Bankruptcy Code, being title 11 of the United States Code, as enacted in 1978 and thereafter amended.

13.    **"Confirmation"** or **"Confirmation of this Plan"** shall mean entry by the Court of an Order confirming this Plan at or after a hearing pursuant to Section 1129 of the Code.

14.    **"Confirmation Date"** shall mean the date on which the Court enters an Order confirming this Plan.

15.    **"Court"** shall mean the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, presiding over this Chapter 11 reorganization case, or any successor court of competent jurisdiction.

16.    **"Creditor"** shall mean any person having a Claim against Debtor.

17.    **"Debt"** shall mean any obligation of Debtor, alone, and any obligation of Debtor and any other Person, to any Entity.

18.    **"Debtor"** shall mean either Shawnee Construction, LLC or Circle L Construction, Inc. as the context requires.  The plural term means both Debtors.

19.    **"Disbursing Agent"** shall mean the Reorganized Shawnee.

20.    **"Effective Date"** shall mean the later of (1) the date that is thirty days after the Final Confirmation Date or (2) October 15, 2020.

21.    **"Entity"** shall include Person, estate trust, governmental unit and the United States Trustee.

22.    **"Estate"** shall mean the bankruptcy estates of the Debtors, or either of them as the context requires, created by Section 541 of the Code upon commencement of the Case.

23.    **"Equity Interest Holders"** shall mean holders of the equity interests in the Debtors.

24.    **"Final Confirmation"** shall mean that date which is fourteen (14) days following the entry of the Order Confirming Plan, during which period of time no Notice of Appeal is filed, or if a Notice of Appeal is filed, during which period of time no Motion for Stay Pending Appeal is granted or supersedeas bond is approved and filed.

25.    **"Final Order"** shall mean (i) an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for rehearing, shall then be pending, or (ii) in the event

that an appeal, writ of certiorari, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order may be appealed, or certiorari has been denied, and the time to take any further appeal, petition for certiorari or rehearing shall have expired; provided, however, that the Confirmation Order may be treated as a Final Order if no stay pending appeal has been obtained.

26.     **"Order Confirming Plan"** shall mean the Order of the Court determining that this Plan meets the requirements of Chapter 11 of the Code and is entitled to confirmation under Chapter 11 of the Code.

27.     **"Petition Date"** shall mean the date on which the Debtor filed this proceeding, June 16, 2020.

28.     **"Plan"** shall mean this Plan of Reorganization in its present form or as it may be amended, modified or supplemented.

29.     **"Priority Claim"** shall mean any Claim entitled to priority pursuant to Section 507(a) of the Code except for Tax Claims and Claims incurred by the Debtor post-petition in the ordinary course of business.

30.     **"Rejection Claim"** shall mean any Claim arising out of the rejection of a lease or executory contract pursuant to Section 365 of the Code, which Claim shall be treated as an Unsecured Claim.

31.     **"Reorganized Debtor"** shall mean the entity which shall assume title to and control of the Debtors' assets and liabilities upon confirmation as provided herein.

32.     **"Secured Claim"** shall mean an Allowed Claim secured by a lien, security interest, or other encumbrance on the properties owned by the Debtor, which lien, security interest, or other encumbrance has been properly perfected as required by law, to the extent of the value of the property encumbered thereby. That portion of such Claim exceeding the value of the security held therefor shall be an Unsecured Claim, as defined below and determined pursuant to 11 U.S.C. §506(a).

33.     **"Sub-Chapter V Trustee"** shall be that person appointed under 11 U.S.C. §1183.

34.     **"Substantial Consummation"** shall occur upon Reorganized Debtor's commencement of payments to creditors as provided in this Plan.

35.     **"Tax Claims"** shall mean any Claim entitled to priority under Section 507(a)(8) of the Code and shall include the claims of taxing authorities for taxes owed on the property retained by the Debtor under this Plan.

36.     **"Unsecured Claim"** shall mean any Allowed Claim, whether or not liquidated or contingent other than a Priority Claim, a Tax Claim, or a Secured Claim.

III          <u>REPRESENTATIONS</u>

**NO REPRESENTATIONS CONCERNING THE DEBTORS ARE AUTHORIZED BY THE DEBTORS OTHER THAN THOSE SET FORTH IN THIS PLAN. THE DEBTORS RECOMMEND THAT ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH IS NOT CONTAINED IN THIS PLAN SHOULD NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN. ANY REPRESENTATION OR INDUCEMENT MADE TO YOU NOT CONTAINED HEREIN SHOULD BE REPORTED TO THE ATTORNEYS FOR DEBTORS WHO SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.**

**ANY BENEFITS OFFERED TO THE CREDITORS ACCORDING TO THE PLAN WHICH MAY CONSTITUTE "SECURITIES" HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE FEDERAL SECURITIES AND EXCHANGE COMMISSION ("SEC"), THE TEXAS SECURITIES BOARD, OR ANY OTHER RELEVANT GOVERNMENTAL AUTHORITY IN ANY STATE OF THE UNITED STATES. IN ADDITION, NEITHER THE SEC, NOR ANY OTHER GOVERNMENTAL AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PLAN. ANY REPRESENTATIONS TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THE APPROVAL BY THE COURT OF THIS PLAN DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN OR GUARANTEE THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

**THE DEBTORS BELIEVE THAT THE PLAN WILL PROVIDE CLAIMANTS WITH AN OPPORTUNITY ULTIMATELY TO RECEIVE MORE THAN THEY WOULD RECEIVE IN A LIQUIDATION OF THE DEBTORS' ASSETS AND SHOULD BE ACCEPTED. CONSEQUENTLY, THE DEBTOR URGES THAT CLAIMANTS VOTE FOR THE PLAN.**

**DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, ALTHOUGH GREAT**

**EFFORT HAS BEEN MADE TO BE ACCURATE.  THE STATEMENTS CONTAINED IN THIS PLAN ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN.**

## ARTICLE IV
## FINANCIAL PICTURE OF THE DEBTORS
### Financial History and Background of the Debtors

The Debtors are owned and operated by Richard and Patricia Van Weezel.  Circle L was formed in 2003 and is owned by Patricia Van Weezel, while Shawnee was formed in 2016 and is owned by Richard Van Weezel.  Circle L had been previously engaged in the construction business, but for at least a year prior to the Petition Date, Circle L's business was primarily in leasing equipment to Shawnee.  Shawnee's business operations are based on construction and directional drilling lines for fiber optic cable.  Prior to the Petition Date, Shawnee had contracts to perform construction services with several customers and has continued those operations since the Petition Date.

In 2018, the Debtors looked to expand their operations and obtained a loan and line of credit from UMB Bank. UMB Bank officers informed Mr. Van Weezel that the loan agreements would allow him to expand his operation and would only secure a certain portion of this collateral.  He later realized, far too late, that UMB Bank obtained a lien on virtually all of the Debtors' assets and limited the way that the Debtors could borrow against the line of credit. Mr. Van Weezel also learned, again too late, that the terms of the transaction with UMB Bank was similar to a factoring arrangement, which was different from what he was led to believe. As a result, UMB Bank informed the Debtors of defaults in the loan performance, made demand on and later sued the Debtors for not complying with the representations and warranties in the loan documents.  The Debtors were not able to borrow any more funds on their line of credit and had trouble paying other creditors, causing additional note lawsuits.

Subsequently, as the Debtors were trying to turn their operation around and obtain new financing, several of Shawnee's customers caused work stoppages as a result of the COVID-19 pandemic and others began to slow pay Shawnee.  The Debtors attempted to obtain government financing from the SBA, but were only authorized for a small grant.  The Debtors filed this proceeding to avoid having its assets be liquidated for the benefit of UMB Bank, and to work out a viable repayment plan to maintain operations for the benefit of all creditors.

### Post-Petition Events

At the time the Debtors filed this case, they lacked significant funds.  However, the Debtors' owners, the Van Weezels, sold their home prior to the bankruptcy proceeding and used $87,322.47 or more of the proceeds to assist the Debtor's operations. Part of the funds were required to pay for Shawnee's workers on jobs that Shawnee was undertaking when it filed bankruptcy.  The Court granted Mr. Van Weezel an administrative claim for $14,633 for

Shawnee's use of such funds.  However, other funds were provided without any basis for payment back to the Van Weezels and considered investments to capital in the business.

The Debtors' disputes with UMB Bank regarding the use of cash to fund its operations were resolved when Mr. Van Weezel made a payment of $557,000 to UMB Bank to pay down the UMB Bank line of credit and eliminate UMB Bank's lien on Shawnee's accounts receivable, and reduced the amount of UMB Bank's lien to approximately less than $750,000. The $557,000 did not cause there to be any other debt to Shawnee and is better contemplated as a gift to Shawnee.

Shawnee currently has several jobs ongoing in Springfield, Missouri, LaMotte, Iowa and Fort Worth, Texas.

The Van Weezels own a related company called Impact Constructors, LLC ("Impact"). Because of Shawnee's credit situation as a result of the lawsuit brought by UMB Bank, some potential customers would not hire Shawnee as a contractor.  As a new company, Impact can contract with customers without going through such an audit.  In addition, Impact primarily contracts to perform aerial cable installation for companies that Shawnee was not qualified to work for.  Shawnee and Circle L will receive income by leasing equipment to Impact for the services Impact performs.  At this time, Impact has not performed services for any customer.

### Future Income and Expenses Under the Plan

Shawnee expects to profit approximately $100,000 per month for the remainder of 2020 and no less than $60,000 per month in 2021 after payment of its ongoing business expenses. Circle L expects to profit $10,000 per month primarily as a book entry from Shawnee after payment of its ongoing business expenses, which will come from leasing equipment to Shawnee and Impact.  Attached hereto as **Exhibit "A-1" and "A-2"** are projections of gross income, expenses and operating income for the next year. It is anticipated that after confirmation, the Debtors will continue in business and the Debtors believe the income will increase over the next twelve months as companies require more fiber optic cable in new areas and need to replace obsolete fiber. Based upon the projections, the Debtors believe they can service the debt to the creditors under the terms of this Plan.

### Post-Confirmation Management

Shawnee is currently owned 100% by Richard Van Weezel.  Circle L is currently owned 100% by Patricia Van Weezel.  Management of the companies will remain the same.  After confirmation, Mr. Van Weezel will be receiving a salary of $6,500 per month and Mrs. Van Weezel will receive $3,500 per month.

### ARTICLE V.
### ANALYSIS AND VALUATION OF PROPERTY

The Debtors operate companies that provide construction services. The Debtors' hard assets consist of its equipment, its accounts receivable, and the funds it has in the bank on any given day. The valuation of the Debtors' equipment, and accounts receivable, if liquidated, would provide a possible return to creditors of 16% as projected under this Plan.

A liquidation analysis of the Debtor's assets is attached hereto as **Exhibit "B".**

## ARTICLE VI
## SUMMARY OF PLAN OF REORGANIZATION

The Debtors will continue in business. The Debtors' Plan will break the existing claims into 10 categories of Claimants. These claimants will receive cash payments over a period of time beginning on the Effective Date.

**Satisfaction of Claims and Debts**: The treatment of and consideration to be received by holders of Allowed Claims or interests pursuant to this Article VI of this Plan shall be the sole and exclusive means for full settlement, release and discharge of their respective Claims, Debts, or interests. On the Confirmation Date, the Reorganized Debtors shall assume all duties, responsibilities and obligations for the implementation of this Plan. Any class of Claimants failing to vote on this Plan shall be deemed to have accepted this Plan in its present form or as modified or amended as permitted herein.

**Class 1 Claimants (Allowed Administrative Claims of Professionals and Subchapter V Trustee)** are unimpaired and will be paid in cash and in full on the Effective Date of this Plan. Professional fees are subject to approval by the Court as reasonable. Debtor's attorney's fees approved by the Court and payable to the law firm of Ritter Spencer PLLC will be paid immediately following the later of Confirmation or approval by the Court out of the available cash. The Subchapter V Trustee fees will be paid immediately following the later of Confirmation or approval by the Court out of the available cash. In the event the Debtor does not have sufficient cash to pay the Class 1 claims in full the Class one claims will be paid in 6 equal installments or as otherwise agreed. All applications for Administrative Claims must be filed within 30 days of the entry of the Order confirming the Plan, or they will be barred. The Debtor's case will not be closed until all allowed Administrative Claims are paid in full. Class 1 Creditor Allowed Claims are estimated as of the date of the filing of this Plan to not exceed the amount of $40,000.

The Class 1 Claimants are not impaired under this Plan.

**Class 2 Claimants (Allowed Priority Claims of the Texas Comptroller):** The Texas Comptroller has a claim in the amount of $3,438.53. Such claim is a priority claim under the Bankruptcy Code. The claim of the Texas Comptroller is unimpaired and will be paid in cash and in full on the Effective Date of this Plan.

The Class 2 Claimant is unimpaired under this Plan.

**Class 3** (**Allowed Secured Claim of UMB Bank**): On or about September 14, 2018, the Debtors each executed a note and line of credit in favor of UMB Bank of which $1,299,603.21 was due and owing as of the Petition Date. The Note and line of credit was secured by that certain Security Agreement of the same dates, granting UMB Bank a security interest in all the Debtors' assets, including all equipment, and accounts receivable (the "Collateral"), which was perfected by the filing of a UCC security statement in the records of the Texas Secretary of State. After a paydown of such debt of $557,000 and the release of the lien in Debtor Shawnee's accounts receivable, the current amount due is $742,603.21 and shall be satisfied as follows: UMB Bank shall have an Allowed Secured Claim in the amount of $742,603.21 which shall be paid in 60 equal monthly installments with interest at the rate of 5% per annum commencing on the Effective Date. UMB Bank shall retain its current lien on the Collateral until paid in full in accordance with the terms of this Plan. The monthly payment to the Class 3 creditor will be $14,013.84.

The Class 3 Claimant is impaired under this Plan.

**Class 4 (Allowed Secured Claim of Ally Bank):** Ally Bank has a lien granted by motor vehicle installment agreements executed by Shawnee on 8/12/18 for two 2015 Chevy Silverado trucks, identified by VIN 8872 and 1442 (the "Ally Collateral"). As of the Petition Date, the amount due to Ally Bank shall be $48,214.97, and shall be satisfied as follows: Ally Bank shall have an Allowed Secured Claim in the amount of $48,214.97 which shall be paid in 60 equal monthly installments with interest at the rate of 5% per annum commencing on the Effective Date. Ally Bank shall retain its current lien on the Ally Collateral until paid in full in accordance with the terms of this Plan. The monthly payment to the Class 4 creditor will be $909.88.

The Class 4 Claimant is impaired under this Plan.

**Class 5 (Allowed Secured Claim of Ditch Witch Financial Services):** On or about, November 30, 2018 Shawnee executed a note in favor of Ditch Witch Financial Services of which $468,779.71 was due and owing as of the Petition Date. The Note is secured by that certain Security Agreement of the same date, granting Ditch Witch Financial Services a security interest in 2 Ditch Witch 2018 Bore Rigs JT20XP and 2 Ditch Witch 2018 Interstate BST/S trailers (the "Ditch Witch Collateral"), which was perfected by the filing of a UCC security statement in the records of the Texas Secretary of State. As of the Petition Date, the amount due to Ditch Witch Financial Services totals $468,779.71, and shall be satisfied as follows: Ditch Witch Financial Services shall be paid in 60 equal monthly installments with interest at the rate of 5% per annum commencing on the Effective Date. Ditch Witch Financial Services shall retain its current lien on the Ditch Witch Collateral until paid in full in accordance with the terms of this Plan. The monthly payment to the Class 5 creditor will be $8,846.45.

The Class 5 Creditor is impaired under this Plan.

**Class 6 (Allowed Secured Claim of Pinnacle Bank):** On or about 05/09/2019 Shawnee executed a note in favor of Pinnacle Bank of which $250,000 was due and owing as of the Petition Date. The Note is secured by certain CDs (the "Pinnacle Collateral") currently valued at

$126,634.01 as of the same date.  Pinnacle Bank alleges it is secured in other collateral.   As of the Petition Date, the amount due to Pinnacle Bank totals $250,000, of which $126,634.01 is secured, and shall be satisfied as follows:  Pinnacle Bank shall be paid in 60 equal monthly installments with interest at the rate of 5% per annum commencing on the Effective Date. Pinnacle Bank shall retain its current lien on the Pinnacle Collateral until paid in full in accordance with the terms of this Plan. The monthly payment to the Class 6 creditor will be $2,389.74. The remaining amount of Pinnacle Bank's claim will be paid through the unsecured creditor pool.

The Class 6 Creditor is impaired under this Plan.

**Class 7 (Allowed Secured Claim of Wells Fargo Auto)** Wells Fargo Bank has a lien granted by motor vehicle installment agreements dated 2/19/19 executed by Shawnee for three 2019 Ford F350 trucks, identified by VIN 9171, 9169 and 0791 (the "Wells Fargo Collateral"). As of the Petition Date, the amount due to Wells Fargo Bank shall be $174,590.78, and shall be satisfied as follows: Wells Fargo Bank shall have an Allowed Secured Claim in the amount of $174,590.78 which shall be paid in 60 equal monthly installments with interest at the rate of 5% per annum commencing on the Effective Date. Wells Fargo Bank shall retain its current lien on the Wells Fargo Bank Collateral until paid in full in accordance with the terms of this Plan. The monthly payment to the Class 7 creditor will be $3,294.74.

The Class 7 Creditor is impaired under this Plan.

**Class 8 (Allowed Secured Claim of John Deere Financial)** On or about, 8/26/2015, 5/9/2017 & 1/3/2019 Circle L executed notes in favor of John Deere Financial of which $67,798.33 was due and owing as of the Petition Date.   The Notes are secured by the certain Security Agreements of the same dates, granting John Deere Financial a security interest in three JD 35G Compact Excavators identified by VIN 4013, 8545, and 3277 (the "John Deere Collateral"), which was perfected by the filing of a UCC security statement in the records of the Texas Secretary of State. As of the Petition Date, the amount due to John Deere Financial totals $67,798.33, and shall be satisfied as follows:  John Deere Financial shall be paid in 60 equal monthly installments with interest at the rate of 0.00% per annum commencing on the Effective Date. John Deere Financial shall retain its current lien on the John Deere Financial Collateral until paid in full in accordance with the terms of this Plan. The monthly payment to the Class 8 creditor will be $1,130.97.

The Class 8 Creditor is impaired under this Plan.

**Class 9 (Allowed Unsecured Claims of Shawnee)** total estimated at $262,844.07  are impaired and shall be satisfied as follows: All Allowed Unsecured Claims shall be paid by quarterly payments proportionate to the creditors' claim from an unsecured creditors' pool which will be funded by the Reorganized Debtor in the amount over and above what is paid to the Allowed Secured Claims, Allowed Priority Claims and the Administrative Claims. The Debtors shall make quarterly payments from the unsecured creditors' pool on each Allowed Unsecured Claim commencing no later than six months after Effective Date.  To the extent necessary and in the event the Debtors cannot make the payments to the Allowed Unsecured Claimholders at the times expected, the  Debtors shall pay its disposable income as defined by 11 U.S.C. §1191(d)(2) proportionately to the Allowed Unsecured Claims. Based upon the Debtor's current projections attached hereto as Exhibit "A", allowing for a 5% income variance, it is expected that the monthly

payment to the unsecured creditors' pool will be $6,065.00 per month , and quarterly payments to the unsecured creditors will be paid at approximately $18,200 in the aggregate. To the extent the Debtors are required to pay pursuant to their disposable income, then in order to determine the distribution amount, the Debtors shall provide with each distribution a reconciliation of income and expenses, as set forth in attached projections (including, bank statements, check copies, deposit slip copies, backup for expenses including invoices, credit card statements and bills) in sufficient detail to allow the creditors to determine the disposable income of the Debtor. The Debtor shall make distributions to the Class 9 creditors quarterly commencing no later than six months after the Effective Date. The Debtor shall make a total of 18 quarterly payments to the Allowed Unsecured Claimants. Based upon the Debtor's Schedules the Class 9 creditors will receive a minimum of 80% of their allowed claim up to a maximum of 100% of their Allowed Claim.

The Class 9 Creditors are impaired under this Plan.

**Class 10 (Allowed Unsecured Claims of Circle L)** total estimated at $79,704.22 that are different than Shawnee and are impaired and shall be satisfied as follows: All Allowed Unsecured Claims shall be paid by quarterly payments proportionate to the creditors' claim from an unsecured creditors' pool which will be funded by the Reorganized Debtor in the amount over and above what is paid to the Allowed Secured Claims, Allowed Priority Claims, and the Administrative Claims. The Debtors shall make quarterly payments from the unsecured creditors' pool on each Allowed Unsecured Claim commencing no later than six months after Effective Date. To the extent necessary and in the event the Debtors cannot make the payments to the Allowed Unsecured Claimholders at the times expected, the Debtors shall pay its disposable income as defined by 11 U.S.C. §1191(d)(2) proportionately to the Allowed Unsecured Claims. Based upon the Debtor's current projections attached hereto as Exhibit "A", allowing for a 5% income variance, it is expected that the monthly payment to unsecured creditors' pool will be $1,300.00 per month, and quarterly payments to the unsecured creditors will be paid at approximately $3,900 in the aggregate. To the extent the Debtors are required to pay pursuant to their disposable income, then in order to determine the distribution amount, the Debtors shall provide with each distribution a reconciliation of income and expenses, as set forth in attached projections (including, bank statements, check copies, deposit slip copies, backup for expenses including invoices, credit card statements and bills) in sufficient detail to allow the creditors to determine the disposable income of the Debtor. The Debtor shall make distributions to the Class 10 creditors quarterly commencing no later than six months after the Effective Date. The Debtor shall make a total of 18 payments into the Allowed Unsecured Claimants. Based upon the Debtor's Schedules the Class 10 creditors will receive a minimum of 80% of their allowed claim up to a maximum of 100% of their Allowed Claim.

The Class 10 Creditors are impaired under this Plan.

**Class 11 (Current Owners)** are not impaired under the Plan and shall be satisfied as follows: The current owners will receive no payments under the Plan on account of their equity interest for the term of the Plan; however, they will be allowed to retain their ownership in the Debtor.

Class 11 Claimants are not impaired under the Plan.

**No distributions will be made on account of a disputed claim unless such claim is allowed by Final Order. Each Reorganized Debtor will each have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure respecting the Estates.**

**Further, notwithstanding anything to the contrary in this Plan, the Reorganized Debtor shall not be required to make distributions under this Plan of a sum less than $50.00 to any Allowed Claim holder. In such case, the Allowed Amount of such Claims shall be reduced to zero and such funds shall be retained by the Reorganized Debtor.**

## ARTICLE VII
## MECHANICS/IMPLEMENTATION OF
## PLAN AND VESTING OF ASSETS

Debtors anticipate the continued operations of the business to fund the Plan.

On the Effective Date, if the Plan is confirmed pursuant to § 1191(a), title to all assets, claims, Causes of Action, properties, and business operations of the Debtor and of the Estate shall vest and/or revest in the Reorganized Debtors. Thereafter, each Reorganized Debtor shall own and retain such assets free and clear of all liens and Claims, except as expressly provided in this Plan. From and after the Effective Date, except as otherwise described in this Plan, each Reorganized Debtors shall own and operate such assets without further supervision by or jurisdiction of this Court, except as otherwise provided herein.

If the Plan is confirmed pursuant to§ 1191(b), title to all assets, claims, Causes of Action, properties, and business operations of the Debtor and of the Estate shall remain property of the Estate until discharge of the Reorganized Debtors pursuant to § 1192. From and after the Discharge Date title to all assets, claims, Causes of Action, properties, and business operations of the Debtors and of the Estates shall vest and/or revest in the Reorganized Debtors. Thereafter, each Reorganized Debtor shall own and retain such assets free and clear of all liens and Claims, except as expressly provided in this Plan. From and after the Discharge Date, except as otherwise described in this Plan, each Reorganized Debtors shall own and operate such assets without further supervision by or jurisdiction of this Court, except as otherwise provided herein.

If the Plan is confirmed under either § 1191(a) or (b) of the Bankruptcy Code Shawnee shall serve as the Disbursing Agent, without bond, for purposes of making transfers and payments under this Plan.

## ARTICLE VIII. FEASIBILITY OF PLAN

The projections of the future business operations are attached hereto as Exhibit A-1, A-2 and A-3. The Debtors believe that the projections are accurate based upon the current operations of the business. Based upon the projections, the Debtor believes the Plan to be feasible.

## ARTICLE IX
## <u>RETENTION OF JURISDICTION</u>

The Bankruptcy Court shall retain exclusive jurisdiction over this Case after Confirmation, notwithstanding consummation or substantial consummation, to enforce or interpret this Plan, including for the following purposes:

a. to consider and effect any modification of this Plan under § 1127 or 1191 of the Bankruptcy Code;

b. to hear and determine all controversies, suits and disputes that arise in connection with the interpretation, implementation, effectuation, consummation or enforcement of this Plan;

c. to hear and determine all requests for compensation and/or reimbursement of expenses for the period commencing on the Petition Date through the Confirmation Date;

d. to hear and determine all objections to Claims and Interests, and to determine the appropriate classification of any Claim or Interest, and other controversies, suits and disputes that may be pending at or initiated after the Confirmation Date, except as provided in the Confirmation Order;

e. to hear and determine all claims that the Debtor, as debtor in possession qua trustee, could assert under the Bankruptcy Code;

f. to consider and act on such other matters consistent with this Plan as may be provided in the Confirmation Order;

g. to make such orders as are necessary and appropriate to carry out and implement the provisions of this Plan;

h. to approve the reasonableness of any payments made or to be made, within the meaning of § 1129(a)(4) of the Bankruptcy Code;

i. to exercise the jurisdiction granted pursuant to §§ 505(a) and (b) of the Bankruptcy Code to determine any and all federal, state, local and foreign tax liabilities of, and any and all refunds of such taxes paid by the Debtor;

j. to hear and determine any issues or matters in connection with any property not timely claimed as provided in this Plan;

k. to hear and determine any controversies with respect to any settlements approved by the Bankruptcy Court;

l. to determine any and all motions, applications, adversary proceedings and contested matters whether pending in the Case as of the Effective Date or brought subsequently by the

Reorganized Debtor; and

      m. to enter a final decree closing any or all Cases.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, in or related to the Debtor's Estate, including with respect to the matters set forth herein, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE X.
## ALTERNATIVES TO DEBTOR'S PLAN

If the Debtors' Plan is not confirmed, the Debtors' bankruptcy case may be converted to a case under Chapter 7 of the Code, in which case a trustee would be appointed to liquidate the assets of the Debtors for distribution to its Creditors in accordance with the priorities of the Code. Generally, a liquidation or forced sale yields a substantially lower amount. As set forth above, the Debtors equipment is subject to lien of UMB Bank and Administrative Claims of approximately $40,000, as well as Priority Claims. Secured, Administrative and Priority creditors must be paid prior to the unsecured creditors receiving any payment. The Debtors believe a liquidation would result in less of a distribution to the unsecured creditors that proposed under this Plan.

A liquidation analysis is attached hereto as Exhibit "B" shows that unsecured creditors would receive a 16% distribution upon liquidation.

## ARTICLE XI
## STATUS OF EXECUTORY CONTRACTS AND LEASES

All unexpired leases and executory contracts shall be assumed on or before the Effective Date, except for the contracts set forth herein: Month to Month Lease with D&Z Investments. To the extent there are any unexpired leases or executory contracts, which have not been assumed or dealt with in this Plan or Court Order prior to the Effective Date, they are rejected.

## ARTICLE XII
## EVENTS OF DEFAULT AND EFFECT
## THEREOF

Unless expressly provided herein to the contrary, in the event any alleged default under the Plan, any Creditor or party in interest must give a written default notice to the defaulting Reorganized Debtor with copies to counsel of record for the defaulting Reorganized Debtor specifying the nature of the default. Upon receipt of the default notice, the defaulting Reorganized Debtor shall have thirty (30) days to cure such default from the time of receipt of the written notice

of default.  If such default has not been cured within the applicable time period, any Creditor or party-in-interest shall have the right to exercise any and all available remedies, including the right to undertake foreclosure upon any collateral securing the obligation, if applicable.

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NEITHER THE OFFICERS, GUARANTORS, AND DIRECTORS OF THE DEBTORS NOR THE SHAREHOLDERS OR INTEREST HOLDERS SHALL BE DISCHARGED AND RELEASED FROM ANY LIABILITY FOR CLAIMS AND DEBTS UNDER THIS PLAN, HOWEVER, ABSENT FURTHER COURT ORDER UPON NOTICE AND HEARING, THE EXCLUSIVE REMEDY FOR PAYMENT OF ANY CLAIM OR DEBT SO LONG AS THE PLAN IS NOT IN DEFAULT SHALL BE THE PLAN. TO THE EXTENT NECESSARY, ANY APPLICABLE STATUTE OF LIMITATIONS AGAINST COLLECTION FROM ANY THIRD PARTY IS SPECIFICALLY TOLLED FROM THE PERIOD OF TIME FROM THE BANKRUPTCY PETITION DATE UNTIL THE DATE UPON WHICH THE DEBTOR FAILS TO CURE ANY WRITTEN NOTICE OF DEFAULT AS SET FORTH IN THE PLAN.

### ARTICLE XIII <u>DISCHARGE</u>

Upon Confirmation pursuant to 11 U.S.C. §1191(a) to the extent that a Claim or Debt has been dealt with under this Plan, such Claim or Debt will be discharged. Upon confirmation pursuant to 11 U.S.C. § 1191(b) discharge shall occur upon completion of all payments required under this Plan.

The automatic stay imposed by Section 362 of the Code or any preliminary injunction granted by the Court to allow for Substantial Consummation of this Plan shall remain in effect until the Effective Date.  Except as otherwise expressly provided in, or permitted under, this Plan, all Creditors and Interest holders, are permanently enjoined on and after the Effective Date against the collection of Claims against the Reorganized Debtors in any manner other than as provided for in the Plan.

### ARTICLE XIV
### <u>RISKS TO CREDITORS UNDER THE DEBTOR'S PLAN</u>

Claimants and Equity Interest Holders should be aware that there are a number of substantial risks involved in consummation of the Plan.  The Plan contemplates that there will be excess funds to pay Creditor Claims.

### ARTICLE XVI
### <u>TAX CONSEQUENCES TO THE DEBTOR</u>

Implementation of the Plan may result in federal income tax consequences to holders of Claims, Equity Interest Holders, and to the Debtor. In this case most of the creditors will not be paid in full the amount of their claims. Tax consequences to a particular Creditor or Equity Interest Holder may depend on the particular circumstances or facts regarding the Claim of the Creditor or the interests of the Equity Interest Holder. **CLAIMANTS ARE URGED TO CONSULT THEIR OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS**.

## ARTICLE XVII
## PENDING OR ANTICIPATED LITIGATION

The Debtor has evaluated potential claims which may be brought. Shawnee has counterclaims against Gerald Seeton Construction, Inc. Circle L has causes of action against Riverside Operations Group, LLC and Born to Bore Communications, LLC. The Debtor reserves the right to bring any and all such claims available to it under the Plan.

Date: August 14, 2020

Shawnee Construction, LLC

By: Richard Van Weezel

Name:

Its: Managing Member

Digitally signed by Richard Van Weezel
Date: 2020.08.14 16:01:05 -05'00'

Circle L Construction, Inc.

By: Patricia Van Weezel

Name:

Its: PRESIDENT

Digitally signed by Patricia Van Weezel
Date: 2020.08.14 16:00:33 -05'00'

Dated:   August 14, 2020                    Respectfully Submitted,

                                            **RITTER SPENCER PLLC**

                                            */s/ David D. Ritter*
                                            David D. Ritter
                                            State Bar No.: 00791534
                                            15455 Dallas Parkway, Suite 600
                                            Addison, Texas 75001
                                            Tel.: (214) 295-5078
                                            Fax: (214) 329-4362
                                            dritter@ritterspencer.com

                                            **ATTORNEY FOR SHAWNEE
                                            CONSTRUCTION, LLC AND CIRCLE L
                                            CONSTRUCTION, INC.**

                            **<u>CERTIFICATE OF SERVICE</u>**

        I certify that I served this document through this Court's ECF system on the 14th day
of August 2020.

                                            */s/David D. Ritter*
                                            David D. Ritter

**Shawnee Construction, LLC**
**2020 & 2021 Projections**

## Exhibit A-1

| 2020 Projections | MTD Aug 2020 Total | MTD Sep 2020 Total | MTD Oct 2020 Total | MTD Nov 2020 Total | MTD Dec 2020 Total | Total 08/2020 - 12/2020 |
|---|---|---|---|---|---|---|
| **Job Income** | | | | | | |
| ADB - Springfield, MO | $ 172,000 | $ 129,000 | $ 172,000 | $ 129,000 | $ 129,000 | $ 731,000 |
| Excel Utilities - Iowa | 143,438 | 71,719 | - | - | - | 215,156 |
| Excel Utilities - Oklahoma | - | 70,000 | 122,500 | 98,000 | 98,000 | 388,500 |
| **Total Job Income** | $ 315,438 | $ 270,719 | $ 294,500 | $ 227,000 | $ 227,000 | $1,334,656 |
| | | | | | | |
| **Cost of Goods Sold** | | | | | | |
| Labor Expense | 100,000 | 80,000 | 100,000 | 80,000 | 80,000 | 440,000 |
| Fuel Expense | 10,000 | 8,000 | 10,000 | 8,000 | 8,000 | 44,000 |
| Auto/Equip Rental & Expenses | 13,260 | 13,260 | 13,260 | 13,260 | 3,260 | 56,300 |
| Job Materials | 11,000 | 10,000 | 12,500 | 10,000 | 10,000 | 53,500 |
| Lodging Expense | 9,230 | 9,755 | 11,330 | 9,755 | 9,755 | 49,825 |
| Repairs, service, etc | 5,000 | 4,000 | 5,000 | 4,000 | 4,000 | 22,000 |
| **Total Cost of Goods Sold** | $ 148,490 | $ 125,015 | $ 152,090 | $ 125,015 | $ 115,015 | $ 665,625 |
| **General & Admin Expenses** | | | | | | |
| Auto Insurance | 3,655 | 3,655 | 3,655 | 3,655 | 3,655 | 18,275 |
| General Liability Insurance | 3,658 | 3,658 | 3,658 | 3,658 | 3,658 | 18,290 |
| Inland Marine Insurance | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 10,000 |
| Workmens' Compensation | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 6,000 |
| Office Lease Expense | 1,950 | 1,950 | 1,950 | 1,950 | 1,950 | 9,750 |
| Phone Expense | 600 | 600 | 600 | 600 | 600 | 3,000 |
| Internet & Software Expense | 290 | 290 | 290 | 290 | 290 | 1,450 |
| Utilities | 500 | 500 | 500 | 500 | 500 | 2,500 |
| Office Supplies | 125 | 100 | 125 | 100 | 500 | 950 |
| Franchise Tax | - | 3,439 | - | - | - | 3,439 |
| Interest Expense (per Plan) | - | 4,148 | 4,148 | 4,148 | 4,148 | 16,592 |
| **Total Gen & Adm Expenses** | 13,978 | 21,540 | 18,126 | 18,101 | 18,501 | 90,246 |
| **Total Expenses** | 162,468 | 146,555 | 170,216 | 143,116 | 133,516 | 755,871 |
| **Net Income** | $ 152,970 | $ 124,164 | $ 124,284 | $ 83,884 | $ 93,484 | $ 578,786 |

EXHIBIT

A-1

exhibitsticker.com

**Shawnee Construction, LLC**
**2020 & 2021 Projections**

## Exhibit A-2

| 2021 Projections | MTD Jan 2021 Total | MTD Feb 2021 Total | MTD Mar 2021 Total | MTD Apr 2021 Total | MTD May 2021 Total | MTD Jun 2021 Total | MTD Jul 2021 Total | MTD Aug 2021 Total | MTD Sep 2021 Total | MTD Oct 2021 Total | MTD Nov 2021 Total | MTD Dec 2021 Total | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Job Income** | | | | | | | | | | | | | |
| ADB - Springfield, MO | $172,000 | $172,000 | $172,000 | $172,000 | $215,000 | $172,000 | $215,000 | $172,000 | $172,000 | $215,000 | $172,000 | $172,000 | $2,193,000 |
| Excel Utilities - Iowa | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Excel Utilities - Oklahoma | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Alcon | 38,122 | 38,122 | 38,122 | 38,122 | 47,652 | 38,122 | 47,652 | 38,122 | 38,122 | 47,652 | 38,122 | 38,122 | 486,054 |
| **Total Job Income** | **$210,122** | **$210,122** | **$210,122** | **$210,122** | **$262,652** | **$210,122** | **$262,652** | **$210,122** | **$210,122** | **$262,652** | **$210,122** | **$210,122** | **$2,679,054** |
| **Cost of Goods Sold** | | | | | | | | | | | | | |
| Labor Expense | 72,000 | 72,000 | 72,000 | 72,000 | 90,000 | 72,000 | 90,000 | 72,000 | 72,000 | 90,000 | 72,000 | 72,000 | 918,000 |
| Fuel Expense | 8,000 | 8,000 | 8,000 | 8,000 | 10,000 | 8,000 | 10,000 | 8,000 | 8,000 | 10,000 | 8,000 | 8,000 | 102,000 |
| Auto/Equip Rental & Expenses | 13,260 | 13,260 | 13,260 | 13,260 | 13,260 | 13,260 | 13,260 | 13,260 | 13,260 | 13,260 | 13,260 | 13,260 | 159,120 |
| Job Materials | 8,800 | 8,800 | 8,800 | 8,800 | 11,000 | 8,800 | 11,000 | 8,800 | 8,800 | 11,000 | 8,800 | 8,800 | 112,200 |
| Lodging Expense | 7,500 | 7,500 | 7,500 | 7,500 | 8,500 | 7,500 | 8,500 | 7,500 | 7,500 | 8,500 | 7,500 | 7,500 | 93,000 |
| Repairs, service, etc | 4,000 | 4,000 | 4,000 | 4,000 | 5,000 | 4,000 | 5,000 | 4,000 | 4,000 | 5,000 | 4,000 | 4,000 | 51,000 |
| **Total Cost of Goods Sold** | **$113,560** | **$113,560** | **$113,560** | **$113,560** | **$137,760** | **$113,560** | **$137,760** | **$113,560** | **$113,560** | **$137,760** | **$113,560** | **$113,560** | **$1,435,320** |
| **General & Admin Expenses** | | | | | | | | | | | | | |
| Auto Insurance | 3,655 | 3,655 | 3,655 | 3,655 | 3,655 | 3,838 | 3,838 | 3,838 | 3,838 | 3,838 | 3,838 | 3,838 | 45,141 |
| General Liability Insurance | 3,658 | 3,658 | 3,658 | 3,658 | 3,658 | 3,841 | 3,841 | 3,841 | 3,841 | 3,841 | 3,841 | 3,841 | 45,177 |
| Inland Marine Insurance | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 24,700 |
| Workmens' Compensation | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 14,400 |
| Office Lease Expense | 1,950 | 1,950 | 1,950 | 1,950 | 1,950 | 1,950 | 1,950 | 1,950 | 1,950 | 1,950 | 1,950 | 1,950 | 23,400 |
| Phone Expense | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| Internet & Software Expense | 290 | 290 | 290 | 240 | 290 | 240 | 240 | 240 | 240 | 290 | 290 | 290 | 3,230 |
| Utilities | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Office Supplies | 100 | 100 | 100 | 100 | 125 | 100 | 125 | 100 | 100 | 125 | 100 | 100 | 1,275 |
| Franchise Tax | | | | | 3,000 | | | | | | | | 3,000 |
| Interest Expense (per Plan) | 6,124 | 6,124 | 6,124 | 6,124 | 6,124 | 6,124 | 6,124 | 6,124 | 6,124 | 6,124 | 6,124 | 6,124 | 73,488 |
| **Total Gen & Adm Expenses** | **20,077** | **20,077** | **20,077** | **20,027** | **23,102** | **20,493** | **20,518** | **20,493** | **20,493** | **20,568** | **20,543** | **20,543** | **247,011** |
| **Total Expenses** | **133,637** | **133,637** | **133,637** | **133,587** | **160,862** | **134,053** | **158,278** | **134,053** | **134,053** | **158,328** | **134,103** | **134,103** | **1,682,331** |
| **Net Income** | **$76,485** | **$76,485** | **$76,485** | **$76,535** | **$101,790** | **$76,069** | **$104,374** | **$76,069** | **$76,069** | **$104,324** | **$76,019** | **$76,019** | **$996,723** |

EXHIBIT

A-2

exhibitsticker.com

**Shawnee Construction, LLC**
**Annual Projections for 2022**
**2022 through 2024**

| | Exhibit A-3 | | | | | |
|---|---|---|---|---|---|---|
| | Annual 2022 | Monthly 2022 | Annual 2023 | Monthly 2023 | Annual 2024 | Monthly 2024 |
| Total Job Income | $2,200,000 | $183,333 | $2,200,000 | $183,333 | $2,200,000 | $183,333 |
| Total Cost of Goods Sold | $1,188,000 | $99,000 | $1,188,000 | $99,000 | $1,188,000 | $99,000 |
| Total Gen & Adm Expenses | $220,000 | $18,333 | $220,000 | $18,333 | $220,000 | $18,333 |
| Net Income | $792,000 | $66,000 | $792,000 | $66,000 | $792,000 | $66,000 |

EXHIBIT

A-3

exhibitsticker.com

| Exhibit B | | | | |
|---|---|---|---|---|
| **Shawnee Construction, LLC & Circle L Construction, Inc. Liquidation Analysis** | | | | |
| Class | Type | Claim | Estimated Value | Liquidation Value | Claim vs Liquidation Value |
| 1 | Administrative | 40,000 | | | |
| 2 | Texas Comptroller of Public Accounts | 3,439 | | | |
| 3 | UMB Bank | 742,603 | 928,200 | 471,100 | (271,503) |
| 4 | Ally Bank | 48,215 | 40,000 | 34,000 | (14,215) |
| 5 | Ditch Witch | 468,780 | 425,000 | 215,000 | (253,780) |
| 6 | Pinnacle Bank | 126,634 | 126,634 | 126,634 | - |
| 7 | Wells Fargo | 174,591 | 165,000 | 106,000 | (113,591) |
| 8 | John Deere | 67,858 | 75,000 | 61,000 | (67,858) |
| 9 | Unsecured Shawnee | 532,595 | | | |
| 10 | Unsecured Circle L | 171,518 | | | |
| | **Subtotal All Classes** | **2,376,233** | **1,759,834** | **1,013,734** | **(720,947)** |
| | Assets after Liquidation Value Applied | | | | - |
| | Cash | | | | 4,249 |
| | ARs | | | | 267,129 |
| | Deduct Administrative Claims | | | | (40,000) |
| | Deduct Texas Comptroller of Public Accounts | | | | (3,439) |
| | Total after Liquidation & Payment of Administrative & Tax Claims | | | | 227,939 |
| | Unsecured claims | 1,425,060 | | | 227,939 |
| | Chapter 7 distribution | | | | 16% |

**EXHIBIT**

B

exhibitsticker.com